JONES, Judge,
delivered the opinion of the court:
This is a suit to recover the damages in excess of ordinary wear and tear to a six-story office building located in Oklahoma City, Oklahoma, and also the reasonable rental value of the building for the period during which it was occupied by an agency of the defendant after cancellation of the lease.
Plaintiff purchased the building March 9, 1936'. At the time of the purchase it was being used by the Federal Works Progress Administration and its affiliated state and local agencies. The Federal Civil Works Administration and affiliated agencies began using the building in February 1934 under an arrangement by which the City of Oklahoma City paid $600 per month rent for the building. The Civil Works Administration had been organized under the Federal Emergency Relief Act (48 Stat. 55), and the executive orders issued pursuant thereto.
This act, with later amendments and later executive orders, made provision for acceptance of contributions by state and local authorities. Under these provisions the arrangements were made under the supervision and with the approval of Federal officials and the building and equipment were inventoried to the Federal agency. Later, and before the plaintiff purchased the building, the Civil Works Administration was changed to and became absorbed by the Federal Works Progress Administration which had full charge of the building and equipment at the time the plaintiff became the owner.
Prior to the time the plaintiff purchased the building it was owned by the Kansas City Life Insurance Company and had been rented under a memorandum agreement that was subject to renewal.
*338 In December 1936 plaintiff became disturbed because of a lack of public liability insurance. After conferences a written lease agreement was entered into by the plaintiff and the United States which provided that the defendant should pay rent at the rate of $100 per month which it was estimated would be sufficient to cover liability insurance. This was supplemental to the regular rental that was being paid by the City of Oklahoma City. The Government lease provided for renewal from year to year and also stipulated that either party might terminate the lease at any time by giving 30 days’ written notice.
The latter lease contained the usual provision for restoring the premises to the same condition as existed at the time of the making of the lease, reasonable and ordinary wear and tear excepted, and contained the further provision that if the lessor required such restoration she should give written notice thereof to the Government 30 days before the termination of the lease.
The lease was renewed the following year, but on August 23, 1938, the defendant gave notice that it would terminate the lease and vacate the property on and accept no responsibility for any rentals after September 30, 1938. Similar notice was given about the same time by the City of Oklahoma City, the reason given being that the Works Progress Administration would vacate the building by October 1, 1938.
On August 23, 1938, a representative of the plaintiff visited the building, talked to the man who was apparently in charge and who said he had taken the place of the superintendent of the building, and who advised plaintiff’s representative that the defendant would repair the building and equipment and would restore them to good condition.
On October 17, 1938, representatives of the plaintiff and defendant met at the building for the purpose of determining what repairs would be required by plaintiff from the defendant because of damage done to the building and equipment during the period of occupancy. They were unable to agree on the amount. The plaintiff was asked to submit a list of the desired repairs, which she did shortly *339 thereafter. The claim finally submitted by the plaintiff was for a total of $13,325, which included repairs to the building in the amount of $7,025 and 9 months’ rental of the building for the period October 1, 1938 to July 1, 1939, in the sum of $6,300. The list of repairs was made out by a firm of independent and experienced contractors who had erected the building. Their estimate included the amount necessary to completely recondition the building and restore it to approximately the same condition it was in prior to January 10, 1934. The defendant’s regional engineer, after conferences with plaintiff’s representative, made an investigation and estimated the damages to the building, other than normal wear and tear, as not exceeding $1,331. His estimate made no report as to the rental value of the building.
The defendant, while admitting that there were damages above ordinary wear and tear during the period of occupancy, nevertheless insists that plaintiff is not entitled to recover because she did not given written notice more than 30 days prior to the termination of the lease contract that she would require restoration. However, the conversations between representatives of plaintiff and defendant about what repairs would be required began the very day the notice of cancellation was given. Plaintiff was requested by defendant’s representative on October 17, 1938, to submit a written list of the repairs which would be required, which she did soon thereafter. Defendant had an estimate made as to the amount of damages and the cost of restoration. At plaintiff’s instance the firm which had constructed the building made an investigation, and submitted a detailed, written estimate covering essential repairs. Both parties had recognized before the premises were vacated that restoration would be required, and had acted on that basis from the day notice of cancellation was given. There was no delay in preparing estimates and an itemized list was submitted long before the premises were surrendered. We find that the provision for notice was substantially complied with. The major purpose of this type of notice is to convey knowledge of the demand to the opposing party before there is any change in the premises, to the end that the *340 damages and cost of restoration can be accurately determined. The representatives bad full knowledge, they acted on such knowledge, and these acts show they did not intend to insist upon technical written notice. All the purposes of notice had thus been attained, if not in fact complied with. A provision for notice of this character can always be waived. By repeated conversations from the beginning, by requesting plaintiff to furnish a list of repairs, and by the conduct and statements of the parties throughout the period when the matter was under consideration, a formal written notice as such was manifestly waived.[1] It may be added that much of the damage was done in the moving operations. These took place weeks after the time when defendant contends plaintiff should have given notice. Advance notice was necessarily inapplicable to repairs on account of such damages.
At the time the agency of the defendant took charge of the building in 1934 it was approximately 4 years old, and while it had been vacant for some time, and the wooden flooring on the first and mezzanine floors needed cleaning, it was otherwise in good condition. The first floor was of maple, and the mezzanine was of pine. The other floors were of concrete and were covered with carpeting.
During the period of occupancy the building and equipment were damaged in many ways and the proof of the damaged condition at the time the premises were vacated is very direct and positive. The walls had been defaced, tile partitions and fixtures had been removed or disconnected, windows were broken, doors and door frames torn out, the wooden floors were in a rotting condition where water from the numerous coolers had been thrown, and several truck loads of broken glass, plaster, concrete, and other debris were piled up on the premises.
The photographs of record are graphic proof of the unusual damage that had been done, *!tnd this is borne out by the other evidence of injuries to the building and its equipment.
A considerable part of the damage was done when the operating agency and its equipment were being removed *341 from the building to the new quarters, as is hereinafter set out more particularly. The structure had been erected as a business, and not as an office building. In order to suit it to the purposes of the Federal agencies, numerous partitions had been built and from time to time rearranged; holes had been cut in the walls to allow the installation of plumbing and ventilating equipment, and conduits for electric wires. Tile partitions had been removed and radiators removed or disconnected. Some of the toilet fixtures had been removed or replaced. A large air conditioning fan and an electric generator had been installed in the penthouse, and many other changes made in the fixtures and equipment.
When the moving began, according to the testimony of defendant’s employees who had a part in the operations, instead of drawing the nails in the usual way, hammers and crowbars were used to hammer and pry out the partitions. That was one way to get them out. To one skilled in the craft the method may have seemed unorthodox, but after all, the partitions were removed.
To lighten the labor of loading, trucks were driven into the basement, backing into and scarring the walls.
In order to more easily remove the fan and generator from the penthouse the flooring was torn up and one entire side wall taken out. Leading from the roof down to the sixth floor was a concrete stairway and a balustrade with steel posts set in the concrete. A sledge hammer was used to knock down the balustrade, injuring it as well as damaging the stairway. Again, it must be admitted that battering down the wall and tearing up the floor, and hammering the banisters from the concrete stairway was a method of getting the fan and generator down from the roof. But to the architect who designed and to the skilled craftsmen who constructed the building and who estimated the damages, that method must have seemed somewhat brutal.
When asked why he had used such methods the reply of the man in charge was that they were in a hurry. They moved. That much is certain. The scarred building, broken walls, shattered glass and piles of debris were physical evidence that they may have been in a hurry. However, *342 since the moving began the first of October and was not completed until several weeks later, the time element is not so convincing.
The defendant claims that, in determining ordinary wear and tear, consideration must be given to the type of organization which was using the building. That is conceded, but we are unwilling to believe that the treatment of this particular building was typical of the attitude of the Works Progress Administration everywhere. There is nothing in the record to justify any such conclusion. The fact that this agency has lasted through the years, with public support through annual appropriations, and the fine work done by it in many localities, which is a matter of common knowledge, if affording any basis for an inference at all, indicates that its handling of property generally must not have been of the character shown here.
The ruthless method used by this agency in the removal from this particular building indicated an almost reckless disregard of the value of property.
All property other than natural resources is the product of toil and the expenditure of human energy. In every economic system there are defects which need correction, but there are orderly, even creative, ways of readjustment and of thus achieving a desirable purpose. That purpose is never furthered by destructive practices.
The plaintiff contends that she is entitled to the damage that occurred before March 9, 1936, and after February 1934, since there was an obligation on the part of defendant at the time the agencies entered the building to restore it to its original condition at that time. This claim cannot be allowed because for the period prior to plaintiff’s purchase of the property her claim would be under an assignment.[2] There was no privity of contract, express or implied, between plaintiff and defendant covering the period prior to the time the plaintiff became the owner of the property in question. Any ordinarily prudent person in purchasing property takes into consideration its condition at the time of the purchase. It is reasonable to assume that plaintiff did so.
*343 Plaintiff also claims that since the keys to the building were not delivered to her and therefore she was not technically given possession of the building until July 1, 1939, she is entitled to recover the reasonable rental value of the building from October 1,1938 to July 1,1939, which reasonable rental value she alleges to be $700 per month, a total of $6,300.
The claim for rental payments for the property cannot be sustained for the period after the defendant had completely vacated the premises. It is true that neither she nor her representative was given physical possession of the key, but no demand was made therefor. It is doubtful, in view of the testimony of plaintiff’s representative, whether she particularly desired the key before the negotiations regarding the restoration of the building were further along. At any rate, there is no evidence of any further use of the building by the defendant, or of any intentional withholding of the key to the premises.
Considering the whole case we feel that the amount which we are allowing is not sufficient to compensate for the restoration cost on account of the damages in excess of ordinary wear and tear that were caused during the period of plaintiff’s ownership and defendant’s occupancy, and to pay the rental on the building for the period during which it was actually occupied after rental payments had ended, but the uncertainty as to when a part of the damages occurred and the lack of proof as to some of the items prevent us from giving plaintiff full compensation.
After eliminating all damages that occurred prior to March 9, 1936, considering only the repairs made necessary on account of damages occurring after that date, and charging defendant with the reasonable rental value of the building only for the period of actual use and occupancy after the cancellation date, we find there is due plaintiff the sum of $4,345.
Judgment will be entered in favor of plaintiff in the sum of $4,345. It is so ordered.
MaddeN, Judge; Whitakee, Judge; LittletoN, Judge; and Whalet, Chief Justice, concur.

 Ford et al. v. The United States, 17 C. Cls. 60; Barlow et al. v. The United States, 35 C. Cls. 514; Rice v. Fidelity & Deposit Co. of Maryland, 103 F. 427.

 31 U. s. C. A. 203.