**BROOKLYN WATERFRONT TERMINAL CORPORATION v. UNITED STATES.**

No. 48679.

United States Court of Claims,
June 5, 1950.

Madden, J., dissented.

Chester T. Lane, Washington, D. C., for plaintiff.

David D. Hochstein, Washington, D. C., with whom was Assistant Attorney General A. Devitt Vanech, for defendant.

944

Before JONES, Chief Judge, and HOWELL, WHITAKER and LITTLETON, Judges.

HOWELL, Judge.

This action was instituted to recover damages in the sum of $350,000 for the alleged breach of covenants by the United States to maintain the plaintiff's premises in good repair and tenantable condition and to restore the premises to the same condition as that existing at the time the defendant entered upon the property, in accordance with the terms of Lease No. NOy (R)–32260, dated January 5, 1943, as amended, and Lease No. NOy (R)–42962, dated July 1, 1947.

On January 5, 1943, the plaintiff leased to the United States certain commercial warehouse property located in Brooklyn, New York, which consisted of approximately 17.464 acres of land, 33 buildings having a total of 436,800 square feet of storage space, and two slips. The lease provided that the premises were to be used exclusively for "naval purposes" and ran from January 5, 1943, to June 30, 1944, at an annual rental of $200,000, and was renewable by the United States from year to year upon 60 days' notice in writing and was subject to cancellation by the defendant upon 30 days' notice in writing. The United States duly renewed and extended the lease for successive annual periods to and including June 30, 1947.

On July 1, 1947, the parties entered into a new lease, designated as NOy (R)–42962 which covered buildings Nos. 1 through 15, containing approximately 228,120 square feet of storage space, two open areas together with the north half of the larger slip. This lease was for the period July 1, 1947, to June 30, 1948, at an annual rental of $77,333.55, and provided that the premises were to be used exclusively for "naval purposes." It contained the same provisions as to renewal and cancellation as the previous lease of January 5, 1943. The lease was duly terminated by the United States on December 31, 1947, by written notice dated December 1, 1947, and a confirming notice of termination dated December 16, 1947. The lease of January 5, 1943, and the lease of July 1, 1947, contained the following provisions:

"8. The Government shall have the right, during the existence of this lease, to make alterations, attach fixtures, and erect additions, structures, or signs, in or upon the premises hereby leased * * *; which fixtures, additions, or structures so placed in or upon or attached to the said premises shall be and remain the property of the Government and may be removed therefrom by the Government prior to the termination of this lease, and the Government, if required by the Lessor, shall, before the expiration of this lease or renewal thereof, restore the premises to the same condition as that existing at the time of entering upon the same under this lease, reasonable and ordinary wear and tear and damages by the elements or by circumstances over which the Government has no control, excepted: * * *.

*    *    *    *    *    *

"12. The Government shall maintain the said premises, buildings, equipment, piers, bulkheads, slips, and appurtenances in good repair and tenantable condition during the continuance of this lease."

During 1946 and 1947 the lease of January 5, 1943, was modified on seven separate occasions by formal written agreement of the parties, whereby certain portions of the premises were eliminated from the operation of the lease as of specified dates, and the original rental reduced proportionately. The lease of January 5, 1943, was cancelled by paragraph 4 of the seventh modification which provided as follows:

"It is agreed that lease NOy (R)–32260 is hereby cancelled by agreement of the parties as of June 30, 1947."

Each of the first six modifications of the lease of January 5, 1943, contained a formal provision releasing and discharging the defendant from any liability or claim arising out of the defendant's use and occupancy of the portions of the premises eliminated from the lease and as to which the lease was cancelled by the modification. The property involved in this proceeding, therefore, consists of those portions of the plaintiff's premises which were not surrendered pursuant to the first six modifications. This

constitutes the property covered by the seventh modification, that property covered by the new lease of July 1, 1947, and that portion of the plaintiff's property included in the 1943 lease, not covered by any modifications to the 1943 lease nor included specifically in the 1947 lease and to which the plaintiff never did give the defendant a release, all described with more particularity in our Finding 12.

The buildings varied considerably as to age, type of construction and condition when the defendant took possession in 1943. Ten of the buildings were two-story brick warehouses having concrete first floors and heavy wood plank second floors. Four of the buildings were one-story brick structures with concrete floors. The other buildings were made of corrugated steel or iron and had concrete or wood plank floors except Building No. 20 which was a one-story stucco warehouse. The pavement adjacent to the buildings and throughout the property was macadam, asphalt or concrete.

The premises were used by the United States exclusively for the storage of naval supplies and throughout the period involved in this suit were under jurisdiction of the Supply Department of the New York Naval Shipyard, Brooklyn, New · York. During the defendant's occupancy of the premises, the supply officer made an inspection three or four times weekly for the purpose of observing the general condition of the storage and the condition of the buildings and outside areas and to ascertain whether the property was being kept in a good state of repair. In addition, the storehouse superintendent visited the property every day for two or three hours and accompanied the supply officer on his regular formal inspection of the premises every Friday. The storehouse supervisor also inspected the premises every other day.

Defective conditions requiring repairs inside or outside the buildings were reported to the supply officer or were noted by him on his inspection of the property and all minor repairs to the premises were authorized by him and were made by the maintenance crew of his department. Defects of a substantial nature requiring major repairs were reported to the Public Works Department by the supply officer and those repairs were made by that department. In each instance when defects requiring major or minor repairs were reported to or noted by the supply officer, the repairs were made. During the defendant's occupancy of the plaintiff's premises, the sum of $100,851.66 was expended by the Public Works and Supply Departments of the New York Naval Shipyard to improve the property and maintain it in good repair and tenantable condition for naval purposes, covering in part repairs to those portions of the premises not here in controversy, the same having been released as described in Finding 8.

On March 17, 1947, and May 21, 1947, the plaintiff wrote to the Commandant, Third Naval District, New York, requesting that repairs be made to the leased premises, and on December 10, 1947, in acknowledging the Commandant's letter of December 1, 1947, giving notice of termination of the lease, the plaintiff made demand for restoration and requested that repairs be undertaken. On January 13, 1948, the plaintiff demanded prompt restoration and repair of the property and particularly the repair of leaders, gutters and roofs. This letter was acknowledged on January 19, 1948, by the assistant to the public works officer who stated:

"With respect to the alleged damaged condition of leaders, gutters, and roofs you are advised that the Navy Department does not propose to make any repairs to the premises but, should it be determined that a legal responsibility exists for such repairs to be made, you will be reimbursed for a reasonable cost of making such repairs to the property as are deemed necessary."

Although the plaintiff alleged in its petition that the defendant failed to comply with paragraph 8 of the leases requiring the defendant, upon proper demand, to restore the premises to the same condition as that existing at the inception of the leases and failed to maintain the premises in good repair as required by paragraph 12 of the leases, the plaintiff elected to try this case upon the issue of whether the defendant had maintained the premises in good repair and tenantable condition in accordance with the requirements of paragraph 12 of the leases. The plaintiff also waived all claims with

respect to the premises covered by the first six modifications of the 1943 lease.

The evidence establishes that the defendant subjected the premises to heavy use and that while it had a maintenance and repair policy under which it spent considerable sums, the premises here in issue were not in good and tenantable condition when the second lease was terminated on December 31, 1947. It is found that to put the premises in good repair and tenantable condition for the purposes for which leased, namely, naval purposes, would require an expenditure of $33,319. The plaintiff, however, contends that the covenant by the defendant to maintain the premises in good repair and tenantable condition renders the defendant liable for the cost of putting the property in such repair and condition for the plaintiff's purposes or use, namely, the conduct of commercial terminal and warehousing operations involving storage of bagged and perishable foodstuffs such as cocoa, sugar and coffee. To put the property in good repair and tenantable condition for the purposes required in the conduct of the plaintiff's business would cost $172,321.62. The defendant argues that the covenant in question required the defendant to maintain the premises in good repair for the purposes for which the property was leased and not for the plaintiff's purposes. That is the principal issue of law here.

Before passing to the above issue, it will be noted that we have reduced the commissioner's finding of $180,271.62, for repairs meeting the plaintiff's purposes, by $7,950, the sum he found would be due the plaintiff for restoration of its original electrical system. We think that the plaintiff as a matter of law is not entitled to recover anything for the electrical system. The system which existed on the premises when the defendant first took over the property, though primitive, was apparently adequate for the plaintiff's needs at that time. It was not adequate for naval purposes, however, and the defendant installed a new system at a cost to the defendant of $17,024.13, doing, in addition, $3,219.50 worth of general electrical work. This new and improved electrical system, adequate for naval purposes, did not meet the requirements of the Administrative Code of New York City, the standards of the New York and National Boards of Fire Underwriters or the New York City Sanitary Code, the latter adopted during the defendant's occupancy. Neither would the original system meet these requirements. The plaintiff contends it is entitled to a recovery of $5,175 as the cost of removal of the system installed by the defendant, together with the sum of $25,000 as the cost of installing a new or third system meeting the requirements of the Administrative and Sanitary Codes in effect at the time of the defendant's surrender of the premises. The commissioner rejected this view but apparently sought to make the plaintiff whole by giving it back what it had to start with. The defendant says that the commissioner's finding relates to restoration and not repair, that restoration was abandoned as a theory of the plaintiff's case and that the case was not tried on this theory, the sole issue being the defendant's liability under the repair clause of the leases. The plaintiff's election as to the theory for trial of its case is as the defendant states but the defendant was not prejudiced with respect to the item here in question for there is the defendant's own evidence in the record as to the condition of the electrical system at the beginning of the defendant's occupancy of the premises. We do not think, therefore, that the defendant's argument proves the commissioner was wrong in finding a sum based on restoration. The defendant is right but for the wrong reason. It is found that the electrical system installed by the defendant was kept in good operating condition and repair throughout the defendant's occupancy of the premises. Did this fulfill its obligation under the lease? We think it did. As before stated, the lease of January 5, 1943, was cancelled by mutual agreement of the parties as of June 30, 1947, by paragraph 4 of the seventh modification dated July 1, 1947. The parties then entered into a new lease on July 1, 1947. Cancellation of the lease of January 5, 1943, was equivalent to a constructive surrender of possession to the lessor at expiration of the first term and the defendant was thereafter under a new tenancy just as if it had actually removed from

the premises and had taken another lease and returned to the premises. Loughran v. Ross, 45 N.Y. 792, 794, 6 Am.Rep. 173; Stephens v. Ely, 162 N.Y. 79, 56 N.E. 499; Precht v. Howard, 187 N.Y. 136, 140, 79 N.E. 847, 848, 9 L.R.A.,N.S., 483; Application of Zohlman, Sup.1947, 76 N.Y.S.2d 388. The defendant fulfilled its obligation to keep the electrical system, existent at the beginning of the July 1, 1947, lease, in good condition. That was the system installed by the defendant. The plaintiff's general demands of December 31, 1947, and January 13, 1948, for a restoration of the premises to the condition of the same as existing January 5, 1943, even if assumed to have been demands for restoration of the original electrical system, were not then in order, the defendant's obligation under the restoration clause of the first lease being after July 1, 1947, limited to the property covered by the seventh modification to the first lease, no release having been given therefor by the plaintiff to the defendant. If it be contended that at least on this theory the plaintiff is entitled to restoration of its original electrical system in those portions of its premises specified in the seventh modification to the January 5, 1943, lease, we can only say that there is no evidence indicating that such an electrical system is so divisible.

■ There remains the plaintiff's contention that a tenant who has covenanted to keep premises in good repair is under obligation to keep them in such condition as will make them conform to ordinances passed while the tenant was in possession, whether those ordinances were applicable to the tenant or not, and that failing to do so it cannot be said in fact or law that the premises were kept in good and tenantable condition. In a variety of situations courts have exonerated tenants from paying for repairs or modifications called for by municipal or other governing authorities, or of a structural or substantial nature, on the ground that the parties to the particular leases could not be held to have contemplated such unforeseen and drastic contingencies. We construe that to be the situation here and so find the plaintiff's contention not tenable. Richard Paul, Inc., v. Union Improvement Co., D.C., 59 F.Supp. 252;

Herald Square Realty Co. v. Saks & Co., 215 N.Y. 427, 432, 109 N.E. 545; Borden v. Hirsh, 249 Mass. 205, 143 N.E. 912, 33 A.L. R. 526. See, also, 33 A.L.R. 532 and 32 Am.Jur., Landlord and Tenant, Sec. 661 (p. 525) and cases collected there.

We now consider the basic questions heretofore described, as to whether or not the defendant discharged its obligation to keep the premises in good repair and tenantable condition and, if not, how much and on what theory the plaintiff is entitled to recover on account of the defendant's default. The plaintiff's theory would subject the defendant under our findings to the corrected total liability of $172,321.62 and the defendant's theory of the meaning of the covenant in the leases would impose upon it by our measure a liability to the plaintiff for $33,319. The commissioner has certified to us these two sets of figures, either of which we can accept, depending on the principle of law we feel to be properly applicable. We hold that the plaintiff is entitled to recover in this case the sum of $33,-319 for the defendant's failure to keep the premises in good and tenantable condition for the purposes for which leased.

■ There is nothing novel about the general tenor of covenants as contained in the leases executed by the parties, calling for restoration of the property in the same condition as when entered upon by the lessee, less reasonable ordinary wear and tear and damages by the elements, and imposing upon the lessee the responsibility to keep the property in good and tenantable condition. The novelty of the case and difficulty of our problem arise from the fact that the record is without evidence on the matter of restoration; indeed, the plaintiff's counsel not only elected to try his case without proof on that covenant in the lease but stated to us on oral argument that he did not know what the condition of the property was when the leases were made. We must then look to the liability of the defendant under its covenant to keep the property in good and tenantable condition. The mere fact that the record contains no evidence which would instruct us or would impose any liability on the defendant for restoration does not mean that we are

bound by the plaintiff's election to the extent that we must not and cannot construe the covenant in paragraph 12 of the lease without reference to the provisions of the restoration clause in paragraph 8. On the contrary, the covenants and all the circumstances must be construed together so that the one to repair be not absolute. Thompson on Real Property (Perm.Ed.), Vol. 3, Sec. 1346, p. 522; Judkins v. Charette, 255 Mass. 76, 151 N.E. 81, 45 A.L.R. 1; King v. Richards-Cunningham Co., 46 Wyo. 355, 28 P.2d 492, and cases cited. In construing the meaning of a covenant in a lease obligating the Government as lessee to maintain the premises, the applicable law is federal, rather than State, although in absence of federal cases in point the courts may properly turn for guidance to the general law of landlord and tenant. Girard Trust Co. v. United States, 3 Cir., 149 F.2d 872; Id., 3 Cir., 161 F.2d 159. The United States, in its leases of private property, is governed by the same rules of liability as would be applicable to a lessee who was a private citizen. United States v. Bostwick, 94 U.S. 53, 24 L.Ed. 65. Not only must the two covenants, before described, be construed together but in finding the meaning of what is good repair and tenantable condition we must give consideration to the age and structural character of the property, uses to which adapted, and contemplated use and kind of business the tenant was going to carry on with the premises. Codman, et al. v. Hygrade Food Products Corp. of New York, 295 Mass. 195, 3 N.E.2d 759, 106 A.L.R. 1354. Covenants under which a lessee agrees to keep or maintain property in good repair seem generally construed with reference to the intended use to which the property is to be put by the lessee. Myers v. Burns, 35 N.Y. 269; White v. Albany Railway Co., 17 Hun, N.Y., 98. For instance, while there was no differing use by lessor and lessee, the principle was firmly stated in Kann v. Brooks, 54 Ind.App. 625, 101 N.E. 513, 514, where certain premises were leased as a stone mill and the lease contained a covenant that the lessees would keep the premises in "good and sufficient repair" at their expense and another covenant that they would surrender the premises at the termination of the lease "in like [good] order and repair as the same now are, reasonable wear and tear excepted." The court stated that it construed the instrument to give effect to all of its parts and that the effect of the covenant to keep the premises in good and sufficient repair was to be interpreted as requiring the lessees to keep the property in good repair for the intended use of the premises for a stone mill and that the covenant to surrender the premises in good order and repair did not make the tenant liable for any depreciation due to wear and tear of the premises as were incident to the use for which they were leased. Again, in Kaplan v. Flynn, 255 Mass. 127, 150 N.E. 872, 873, 45 A.L.R. 6, there was a lease of a new building for use as a moving picture theatre. The tenant covenanted to keep the premises in such repair "as the same are in at the commencement of said term, * * * reasonable use and wear * * * only excepted" and to surrender the same at the end of the term "in good tenantable repair in all respects, reasonable wearing and use thereof * * excepted." In a suit by the tenant to enjoin a forfeiture of the lease by lessor who alleged the tenant had not kept the premises in repair as required by the covenant, the court stated, in part:

"Although the building was new at the beginning of the lease, it was of cheap construction and the lessee, under the covenants in the lease, was not liable for defects arising from the original construction of the building. Conditions must be taken into account and the character of the constructions must be considered * * *. The covenant in question must also be considered with reference to the use the premises were to be put to and the business to be carried on. It was a lease of a moving picture theater, 'the use and wear' of which 'is severe,' and this is 'a recognized fact,' according to the finding of the master * * (citing cases)."

This is not to say that a covenant to maintain in good repair and tenantable condition gives license to a lessee arbitrarily to waste the property under guise of the argument that he may not deem repairs as necessary for the purposes for which it was

leased. Even in absence of any covenant to maintain at all there is a common law obligation, in the absence of an express provision to the contrary, not to commit voluntary waste. This implied covenant also requires restoration of the premises to the lessor in the same condition as received, reasonable wear and tear excepted. Both elements of this implied covenant are construed with reference to the intended use of the property by the lessee. United States v. Bostwick, supra; Pearson v. United States, 75 Ct.Cl. 375; Mount Manresa v. United States, 70 Ct.Cl. 144; Colton v. United States, 71 Ct.Cl. 138; Italian National Rifle Society v. United States, 66 Ct.Cl. 418; New Rawson Corp. v. United States, D.C. Mass.1943, 55 F.Supp. 291. Such an obligation rested upon the defendant both by the covenant in the leases and by common law and that the defendant recognized it as such is indicated by the considerable sums it spent in repairing the premises during its occupancy. The property was subjected to heavy use. How this heavy use may have affected the property is shown by the record but it is not shown how that use, as reflected in the condition of the property now, is responsible for conditions depleting the property more than it already was when leased. To get around this, the plaintiff argues that no evidence of its original condition is necessary for under the covenants the defendant has the obligation to put it in good and tenantable condition if it was not in such condition when leased, and to keep it so. This seems to us an extreme view and hardly within contemplation of the parties as shown by the leases themselves and the circumstances surrounding their execution. With due respect to their age and condition the defendant did repair the properties and while doubtless not to the extent desired by the plaintiff, the latter lost no time in resuming use for its own purposes of the properties as released to it by the defendant, often moving right in the same day. We cannot agree that the covenants here in question made the defendant the insurer of the plaintiff's premises. Such would be the effect of the plaintiff's theory if adopted. That such may have been the effect of the judgment of courts in some jurisdictions does not warrant us in making the same mistake, Lehmaier v. Jones, 100 App.Div. 495, 91 N.Y.S. 687; Lockrow v. Horgan, 58 N.Y. 635, especially when doubt has been cast upon the wisdom of such a conclusion by more recent review. May v. Gillis, 169 N.Y. 330, 62 N.E. 385. We do not believe that our view is in conflict with the holding in Girard Trust Co. v. United States, supra, [149 F.2d 874] for in that case there was an absolute covenant binding the Government "during the occupancy of the premises * * * (to) maintain, repair, operate and service the building." There was no clause in the lease imposing upon the lessee the responsibility to restore the premises in the condition in which received or to keep in good and tenantable condition other than as stated in the absolute covenant quoted above. Not only, therefore, was there a different covenant but the issue concerned responsibility for payment for defects specifically existing in the electrical installations. The lessor made the required repairs after the lessee refused to do so and sued for their cost. The court found that the repairs made were necessary and that the lessee having obligated itself to maintain, repair, operate and service the building without specifying any limitations other than repairs to the roof and sidewalks, and those made necessary by reason of damage resulting from fire or other casualty, obligated itself to do the maintenance and repair work in question. Further, the court held that such obligation was imposed by the lease without respect to whether the dangerous conditions were concealed or existing at the time of occupancy or arose from use of the building and the covenant involved the obligation to remedy such defective conditions without regard to the time of or the cause for their existence. Manifestly, there is no such absolute covenant in the language of paragraph 12 "to maintain said premises * * * in good repair and tenantable condition during the continuance of this lease," especially when construed with paragraph 8 as it must be under authorities we have cited. The covenants of the agreement must decide the obligation of the parties. United States v. Bostwick, supra. There is no reason why a lessee cannot be bound to repair

pre-existing defects but if it is within the contemplation of the parties it seems to us it ought to be spelled out with positive language and unrestricted by the covenants, as in the Girard case. If the conditions arise from use of the building and there is no dispute in understanding the purpose for which the premises were let, the fair view seems to limit the damages to those in excess of ordinary wear and tear that were caused by the use of the property for the purpose specified. Smith v. United States, 96 Ct.Cl. 326. In the latter case the lessee used as a WPA office building premises constructed for a furniture business. This court held that the plaintiff, insofar as she was entitled to recover, could hold the defendant liable only for damages in excess of ordinary wear and tear that were caused by the defendant in its use of the property as an office building. To the same effect are Pearson v. United States, 75 Ct.Cl. 375; Mount Manresa v. United States, 70 Ct.Cl. 144; New Rawson Corp. v. United States, D.C., 55 F.Supp. 291; and Colton v. United States, 71 Ct.Cl. 138. The common law obligation to keep the premises in good and tenantable condition for the purpose for which leased, involved in the above cases, is the same as it is in paragraph 12 of the leases in the case in issue where the implied covenant is spelled out. In absence of a conflicting covenant or one imposing an absolute or insurer's liability upon the lessee we see no reason why the rule as we have made it applicable to other cases should not apply here. This view is not to be confused with such a situation as existed in Schroth, Receiver v. United States, 74 Ct.Cl. 396, where the United States leased the plaintiff's hotel for use as a hospital. In the lease the United States agreed "to maintain" the premises except for "repairs" to the outside of the main building, and the lessor granted to the United States the right to make such alterations to the interior of the building as it might desire, but not such as would affect "the permanent character" of the building. In that case, due to the plain language by which the lessor sought to preserve the building for later use as a hotel, we held that the premises should be maintained and returned to the lessor in reason-

ably good condition for the purpose specified and against which contingency the lessor guarded himself. There we had the issue of restoration, omitted from the case at bar, and the word "repair" in the lease in the Schroth case was not construed. It is further obvious that the defendant in the pending case has not altered the permanent character of the premises and this is not in issue as in the Schroth case.

In Mills v. United States, 52 Ct.Cl. 452, The Federal Government entered into a lease with the plaintiff for the Mills Building in Washington, D. C. The lease provided that the building would be used only for general office purposes, that the lessee would make all repairs to the premises, other than the roof or for conditions produced by ordinary wear and tear or fire. There was also a covenant to return the property at expiration of the tenancy in like good order as received. The mortar between the pieces of terra cotta in the cornice eroded or yielded with the result that water was admitted, which finally, from freezes or otherwise, caused pieces of the terra cotta to fall and endanger other parts of the cornice. The plaintiff made the repairs and sued for reimbursement. We held that a covenant "to make all repairs" is a general one and does not extend to rebuilding and restoration. Further, we held that at common law a tenant was not impliedly liable for deterioration of the premises from the ordinary wear and tear incident to their reasonable use, or to make substantial and lasting repairs, such as are usually called general repairs. His obligation is, in effect, a covenant against voluntary waste, as we have previously described. His covenant to restore the premises to the lessor in as good a condition as received is merely the expression of the implied obligation resting upon him.

We think it is quite possible that the parties to the leases here before us may not have had a meeting of minds as to what was meant by the covenant set forth in paragraph 12 thereof. The defendant may have thought its liability should be limited to the purposes for which leased and put the purpose in the lease for that reason. The plaintiff may have honestly assumed

differently. There is, however, no evidence that at the execution of the instruments there was any discussion or confusion about it. If there was no meeting of the minds and we were to hold there was no valid lease, the common law would apply and the same result be achieved. But, it is not necessary for us to reach this question for we think that the pattern of the authorities is sufficiently clear on language and circumstances such as here involved so as to leave no grounds for reasonable doubt as to the proper construction to be placed upon the written language the parties chose to employ.

The plaintiff has contended for sums adequate to restore alleged damage to paving by the defendant, which we do not find supported by the evidence, and for certain sign restorations under paragraph 8 of the leases. On the latter, the record is inadequate to support a finding for the plaintiff in view of its election not to assert its claim under this paragraph and the defendant's consequent failure to rebut the same. The plaintiff knew or should have realized when it leased the premises for naval purposes that its own signs would not suit these purposes. Its remedy was provided in paragraph 8 calling for restoration, a remedy the plaintiff by its own election at the trial decided not to assert. While evidence with respect to the signs by this election probably should not have been admitted, we do not think the plaintiff can both assert and not assert under paragraph 8, or eat its cake and have it too.

Mention should be made of the plaintiff's theory that one proper measure of its recovery can be reflected by its claim for deferred maintenance which seeks to compel the defendant to restore the premises to 80% of condition new. We hold with the principle that to cast a financial liability of this magnitude upon the tenant by these leases could hardly have been within the contemplation of the parties. Second United Cities Realty Corp. v. Price & Schumacher Co., 242 N.Y. 120, 124, 151 N.E. 150, 151–152.

■ Upon a careful evaluation of the facts and authorities, considering as a whole the language of the covenants and what we believe to be the reasonable intention of the parties, the age and class of the premises involved, the uses to which the property was to be put, and all the other circumstances surrounding the case as shown by the record, we conclude that the plaintiff is entitled to recover $33,319.

It is so ordered.

WHITAKER and LITTLETON, Judges, and JONES, Chief Judge, concur.

MADDEN, Judge (dissenting).

I am unable to agree with the decision and judgment of the Court. The Government promised in paragraph 12 of the lease to:

"maintain the said premises, buildings, equipment, piers, bulkheads, slips and appurtenances in good repair and tenantable condition during the continuance of this lease."

The Court has interpreted this promise to mean only that the property would be maintained in such repair and condition as would be required for the naval purposes for which the property was leased, though this condition would not be suitable for the use of the premises as a commercial warehouse. I think this interpretation of paragraph 12 is erroneous.

The premises here involved were first leased to the Government by a lease dated January 5, 1943, and running to June 30, 1944, cancellable by the Government on thirty days' notice, and renewable by the Government from year to year on sixty days' notice prior to expiration. It seems to me highly improbable that the parties would, in a lease which bound the lessee for only thirty days, after which time, if the lease was surrendered, the property would be put to its former use as a commercial warehouse, intend that the standard of maintenance of the property would be a standard which might make the property unsuitable for that use. Even if the Government as lessee had been firmly bound for the term of the lease, approximately eighteen months, I would find such an intent highly improbable. In fact, the Government did not surrender its lease on thirty

days' notice, but elected to renew it from year to year, always subject to cancellation. On July 1, 1947, a new lease for one year was made covering most of the property here in question. That lease was likewise subject to cancellation and was in · fact terminated on December 31, 1947. It contained the same paragraph 12 which I have quoted from the original lease of 1943. The language must have, meant the same thing in both leases.

I think, then, that the .Government's obligation under paragraph 12 was to maintain the property in good repair and tenantable condition, for use as a commercial warehouse, the use to which it was devoted before the Government's temporary occupancy, and the use to which both parties expected that it would again be put when that occupancy ceased.

The evidence as to the cost of doing what I think the Government was obliged to do is most unsatisfactory. The plaintiff did not prove the condition of the property at the time it was turned over to the Government.

It was by no means new, and the Government was not obliged to put it in such a condition, or in a condition eighty percent of what it would have been if new. But it was in actual use as a commercial warehouse when the Government leased it, and we may suppose that it was in a reasonably good condition for that use. I by no means agree with the plaintiff that language such as that of paragraph 12 would oblige a short term lessee to put the leased property in good condition, whatever its condition was at the time the lease was made. On the other hand, the Government, objecting to the materiality of the plaintiff's evidence as to the cost of putting the property in condition for commercial warehouse use, did did not refute that evidence and introduced none of its own.

Because of the uncertainty as to the condition of the property at the time it was leased, and a considerable skepticism as to the accuracy of estimates such as those presented by the plaintiff, I would give the plaintiff a judgment for $80,000.00.