**420**

■ We think that in presenting this idea to representatives of the Government and pressing for favorable action the plaintiffs rendered a service. The Galanot Products Company, in evident recognition of the value of such work, had contracted to pay them a commission on any contracts that might be secured. After the services had been rendered the plaintiffs sued that company and a compromise settlement was reached, the terms of which are not disclosed. It is apparent from the entire record that the whole purpose of the entire presentation was to interest the Government in contracting for the manufacture of the seamless casket, with the expectation on the part of plaintiffs that the company which secured the contract would compensate them for their services. When the entire record is considered the plaintiffs have no basis for recovery against the defendant. The petition is dismissed.

It is so ordered.

MADDEN, WHITAKER, and LITTLETON, JJ., concur.

## McNAUGHT v. UNITED STATES.
## No. 88–52.

United States Court of Claims.
Jan. 5, 1954.

William G. Blood, Chicago, Ill., Samuel H. Horne, Albert L. Hopkins, and Hopkins, Sutter, Halls, DeWolfe & Owen, Chicago, Ill., on the briefs, for plaintiff.

Howard O. Sigmond, Washington, D. C., J. Edward Williams, Acting Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, and MADDEN, Judges.

JONES, Chief Judge.

Plaintiff seeks to recover damages to the soil and to the tiling caused by defendant's use of 170 acres of land in Cook County, Illinois, as an outlying flying field under a lease of such property to the Government.

Plaintiff and her husband, now deceased, owned 452 acres of land in Illinois which they used as a dairy and livestock farm. Under date of April 3, 1942, 170 acres of the property were leased to the Navy for the initial period March 1, 1942, to June 30, 1943. Under an optional renewal provision the premises were used until the spring of 1946. The annual rental was $2,550, payable at the rate of $212.50 per month.

Pertinent provisions of the lease are set out in our finding 2.

The terrain was undulating and rolling with some small hills, depressions and valleys. There were no buildings on this particular tract, but there was a tile drainage system. The defendant agreed not to "spread or cause to be spread any gravel * * * nor lay or cause to be laid any concrete * * * over the demised premises or any part thereof, nor do or cause anything to be done * * * which might or could be deterimental to the soil thereof for farming purposes." The usual restoration provisions were contained in the lease. In addition the lease contained the following stipulation:

"All top soil removed at any time during the term of this leasing shall be replaced by the Government after grading operations have been completed, so that said premises may at all times maintain their present state of fertility."

The defendant graded the surface to level it off for use as a flying field. Heavy road-building machinery, such as bulldozers and carryalls, was utilized, the topsoil and part of the subsurface soil were pushed aside, the subsurface soil and subsoil, including clay, were excavated from the high knolls and deposited in the depression areas. A mixture of topsoil and subsurface soil which had been pushed aside was respread over the graded areas.

The grading operations thus caused considerable disturbance to and rearrangement of the soil. On 22½ acres all of the subsurface soil and portions of the subsoil and clay were removed and then spread over with a blend of top and subsurface soil, and fills in the depressed areas were made of a blend of topsoil and subsurface material excavated from the knolls. On much of the remaining portion of the tract there was a mixing of the topsoil with other materials in the process of respreading.

The plaintiff claims that the productive value of the farm was permanently

reduced, and that she is entitled to this reduction in value, plus the damages to the tile drainage system, plus rents for 11 months.

■ At the threshold we are met with the defense that the liquidated damage provision in the "Whereas" portion of the contract should be held to cover all damages. However, if this were correct there would be no point in the other specific obligations of the contract. The entire contract must be construed together. Plaintiff testified that this particular provision was merely to cover the cost of the alfalfa seed, phosphate and lime used on the 170 acres and the plowing done thereon prior to the execution of the lease, all of which were necessarily lost by the entry on the premises. It was stated that it was "fair and just compensation [to be] paid in advance for damages which will necessarily result to the described property and crops planted thereon, by the entry upon and improvements made thereon by the Government."

■ The specific obligation embodied in the later provisions of the contract were much broader. When the contract is read as a whole this appears to be a reasonable interpretation. The most favorable construction of the provision to the defendant would be that it is unclear in the light of the later provisions, thus making an explanation in order. The defendant did not attempt to controvert the testimony of the plaintiff. At any rate the positive obligation to replace the topsoil "so that said premises may at all times maintain their present state of fertility" was an affirmative undertaking the defendant voluntarily assumed.

The record definitely shows that this obligation was not met, that the fertility of the soil was reduced, that the topsoil was replaced mixed with other materials, including clay, and that the value of the tract was materially reduced from what it would have been had the changes not been made, or if the topsoil had been replaced in unmixed condition.

The defendant further claims that it was impossible to restore the topsoil without mixing it with other materials in the process. The record while conflicting shows that it could have been done with only slight mixing. It would have been more troublesome and somewhat more expensive. The defendant used heavy machinery that did the job, but that caused more mixing of other materials with the topsoil than would have otherwise occurred.

As usual the experts, while agreeing that damage was done, differed widely as to the amount, ranging from a low estimate of $2,000 to a high of $22,100 as the reduction in the value of the farm.

The defendant's main expert said the full productivity could be restored by the use of fertilizer and other treatment in three to five years. This is contrary not only to the major evidence in the record, but contrary to practically all the official reports made by those who have made a lifetime study of the subject of soils. Most of these agree that it takes at least 50 years for nature to build a topsoil and that only nature can build it, although fertilizer and other ingredients applied scientifically from time to time will of course increase the yield.

On the other hand the plaintiff's experts testify that the damage was permanent, that the productivity of the soil could never be restored. This is the other extreme.

Experts sometimes baffle us. In the expression of opinion they are not only given the privilege of a wide range, they usually exercise it. Somewhere in this maze we must undertake to find the true level.

The intrinsic value of the soil cannot be discounted. It is the priceless ingredient in the alchemy of life. Man came from the soil and in the end goes back to the soil. It is as essential as the air we breathe. Life cannot be sustained without it. As far back as we have any record of the human race the cultivation of the soil has been the primary occupation of man. It is proved

by experience, it is established by the facts of history, that not only the wealth of a nation, but the character and quality of its people go up and down with the productivity of its soil. No institutions can be permanent when linked to a barren land.

Practically all the new wealth of the world comes from the ground, either from the minerals found in the earth, or from crops that grow in the soil or from livestock that feeds upon the products of the soil. The products may be increased in value by the genius of industry, but the raw materials are essential.

Nature does rebuild and even create soil. It is done over a period of years in nature's laboratory by a hidden process which no man knows.

From a consideration of all the evidence we find that the damage to plaintiff from the failure of the defendant to properly replace the topsoil is $7,500, and that this amount represents the difference in the market value of the property as returned and as it should have been returned pursuant to the terms of the lease.

As set out in findings 19, 20, and 21 we find that the amount of money actually expended by plaintiff in restoring the damage done to the tile draining system in the southeast corner of what is described in the record as the "upper 90" and the "lower 80" was $5,420.25 which was directly attributable to the grading operations with the heavy bulldozers and road-grading machinery. This amount was actually expended by plaintiff in repairing the damage. We do not allow anything for the additional amount, $3,388.24, expended by plaintiff in restoring the part of the system that was located on the northern part of the "upper 90" because that part of the system was not functioning properly at the time the lease period began.

The plaintiff claims $2,337.50 additional rental under the lease contract. The provision under which the claim is made is set out in the footnote.[1] It will be noted that the provision is for rental payments for the balance of the calendar year in which the lease is terminated and two months of the next year, "which * * * shall be considered liquidated damages for loss of use of the land during the regular crop-planting season" and other damages by reason of the cancellation. There is a further provision that upon 30 days' written notice the lease may be cancelled on March 1 of any year without payment of the liquidated damages so provided. The lease was cancelled by agreement just before March 1, 1946. The plaintiff claims rental payments for the remainder of 1946 and two months of 1947.

When the provision is read and construed as a whole it becomes manifest that the specific provision was to pay for loss of the land during the crop year and that if the lease were cancelled not later than March 1 of any year there would be no additional payments. The lease was cancelled before March 1 and the land was actually planted to crops that year. True, the yield was not as great as it probably would have been had the lease never been executed, but this is covered by the recovery for the reduced value of the farm. The whole purpose of the section has thus been served.

1. Upon termination of this lease or any renewal thereof, the Government · agrees to pay rental for the balance of the calendar year in which this lease is terminated and two months of the succeeding calendar year at a rate proportionate to the rate provided in this lease which amount shall be considered liquidated damages for loss of use of the land during the regular crop planting season and any and all other damages suffered by the lessor by reason of cancellation of this lease by the Government, it being understood and agreed that this lease or any renewal thereof may be cancelled on the first day of March of any year, upon thirty (30) days written notice to the lessor, without payment of the liquidated damages above provided in this paragraph.

The lease provided for 30 days' notice and plaintiff could have insisted on that notice, but in that event defendant would have had the use of the land for another year had it so desired. Evidently plaintiff preferred to agree to the cancellation and by so doing waived the 30 days' notice. Smith v. United States, 96 Ct.Cl. 326, 340; Kalbritan v. Padover, 264 Mass. 26, 161 N.E. 898.

The plaintiff is entitled to recover the sum of $12,920.25.

It is so ordered.

MADDEN, WHITAKER and LITTLETON, Judges, concur.

## PHILADELPHIA ELECTRIC CO.
### v.
### UNITED STATES.
### No. 50253.

United States Court of Claims.
Jan. 5, 1954.

Leonard A. Spalding, Philadelphia, Pa., Alfred J. McDowell, Philadelphia, Pa., J. Louis Monarch, and Morgan, Lewis & Bockius, Washington, D. C., on the briefs, for plaintiff.

H. S. Fessenden, Washington, D. C., H. Brian Holland, Asst. Atty. Gen., Andrew D. Sharpe and Ellis N. Slack, Washington, D. C., on the brief, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER and MADDEN, Judges.

WHITAKER, Judge.

Plaintiff is a public utility company. In the computation of its surtax net in-