## CITY OF NEW YORK v. UNITED STATES.
### No. 49329.

United States Court of Claims.
June 5, 1951.

1946, 60 Stat. 963, 37 U.S.C.A. §§ 34 (b, c), 35(a) (1) (iii), 31a note.

The court, having considered the evidence, the report of Commissioner Herbert E. Gyles, and the briefs and argument of counsel, makes the following.

## Special Findings of Fact

1. Plaintiff, The City of New York, is a municipal corporation, duly organized and existing under and by virtue of the laws of the State of New York.

2. Plaintiff has at all times, through its officers and agents, borne true allegiance to the United States of America, and has not in any way voluntarily aided, abetted, or given encouragement to rebellion against the United States.

3. Plaintiff has never sold, transferred or assigned its claim, set forth herein, or any part thereof or any interest therein, to any persons.

4. The jurisdiction of the Court of Claims of the United States is predicated upon an act of Congress of March 3, 1911, in which the jurisdiction of this court is defined, and being Section 145 of Chapter 231, 36 Stat. 1136, and also designated as U.S.C. Title 28, Section 1491.

5. Plaintiff was the owner of the pier located at the foot of 35th Street, in the Borough of Brooklyn, City of New York, from the 12th day of November 1941, up to and including the 15th day of October 1946.

6. By letter dated November 7, 1941, John McKenzie, then Commissioner of Docks of the City of New York, wrote to the Commandant of the Third Naval District as follows:

"In accordance with your verbal request you are informed that the fair market value of the pier located at the foot of 35th Street, Borough of Brooklyn, is $5.62 a square foot. The pier is 1,740 feet long and 175 feet wide, having a total area of 304,500 square feet.

"Rental based on a fair market value of $5.62 a square foot, in accordance with the rental formula approved by the Board of Estimate, would be the sum of $111,142 per annum. From such sum a deduction has been made of $4,095, representing an allowance of 6½% on the estimated cost of repairs to the pier amounting to $63,000. This amount deducted from the formula rental of $111,142 gives a net rental of $107,047 per annum, which has been rounded off to $107,000 for convenience in accounting.

"As you have heretofore agreed, rental for the pier for the year beginning November 16th, 1941, will be fixed at the rate of $119,000 per annum, the extra sum of $12,000 being included to cover the cost of removing the Luckenbach Steamship Company, the present occupants of the 35th Street Pier, to the pier at the foot of 31st Street.

"In the event that your occupation should exceed a period of one year rental under a renewal permit will be fixed at the usual rate of $107,000 per annum."

7. On November 12, 1941, the plaintiff and the defendant executed a lease agreement in writing, under the terms of which the plaintiff leased to the defendant the premises designated as approximately 255,000 square feet of space on the City Pier at the foot of 35th Street in Brooklyn, New York, for a term commencing November 16, 1941, and ending June 30, 1942, at an annual rental of $119,000.

8. On July 1, 1942, the plaintiff and the defendant executed a lease agreement under the terms of which the plaintiff leased to the defendant the premises designated as approximately 304,500 square feet of space on City Pier at the foot of 35th Street in

810

Brooklyn, New York, for a term commencing July 1, 1942, and ending June 30, 1943, at an annual rental at the rate of $119,000 from July 1, 1942, to November 15, 1942, and at the rate of $107,000 per annum for the period November 16, 1942, to June 30, 1943.

9. On May 31, 1943, the plaintiff and the defendant executed an agreement extending and renewing the lease dated July 1, 1942, for the period July 1, 1943, to June 30, 1944, at an annual consideration of $107,000.

10. On July 1, 1944, the plaintiff and the defendant executed an agreement extending and renewing the lease dated July 1, 1942, for the period July 1, 1944, to June 30, 1946, at an annual consideration of $107,000.

11. On June 26, 1946, the plaintiff and the defendant executed an agreement modifying the lease dated July 1, 1942, and its extensions and renewals, to extend its term from June 30, 1946, to October 15, 1946.

12. Paragraph 6 of the leases under which the defendant occupied the premises contains the provision that the property is leased and rental is based on an "as is" basis.

13. During the entire period covered by the agreements, i. e., November 12, 1941, up to and including October 15, 1946, the demised premises were under the sole and exclusive possession and control of the defendant.

14. It is the general practice of the City of New York in leasing its piers to place a provision in the lease contracts requiring the lessee to make all repairs to such piers. However, as a general rule the defendant, in leasing piers from plaintiff, refused to agree to the inclusion of such a provision in the lease contract. In the instant case neither the leases nor the renewal and extension agreements under which the United States occupied the premises contained any provision whatever with respect to repairs to the pier during the occupancy by the United States.

15. At the time of the commencement of defendant's occupancy of the demised premises, the pier and structures were apparently in tenantable condition. However, the actual detailed physical condition of the pier, especially as to the understructure, as of the date of the commencement of defendant's tenancy, is not shown.

16. On October 15, 1946, the defendant vacated the demised premises and the plaintiff accepted custody as of that date.

17. The pier was built in 1915. It is 1,739 feet long by 175 feet wide and is a wooden constructed pier, that is, its substructure consists of wooden piles, cross clamps, and side-cap rangers with a concrete deck. The pier is supported by 6,800 wooden piles. A one-story shed containing 166 overhead doors and 4 rolling shutter doors extends for almost the length of the deck.

The piles on both sides at the end of each row are the line piles. Those on the inside which support the pier proper are the interior bearing piles. And those piles which are driven in at an angle at the end of each row to reinforce that particular row are the bracing piles.

Timber known as side cap is placed longitudinally along and on top of the line piles. Timbers, known as cross clamps, are placed to rest on the side cap, crossways on the pier. Horizontal braces, which are 5 x 10 timbers, are placed at the rows and fastened to the piles at about low-water level to reinforce the pile row. Two timbers known as side and shed rangers are placed to run longitudinally with the pier on the top deck side and the concrete deck is placed up against the side and shed rangers.

Along the outside of the rows of piles are placed fender piles and these fender piles support the fender system, consisting also of fender cap which is timber placed on top of the fender piles for the purpose of holding the fender piles in place, and fender chock which is timber placed between the fender piles to prevent ships from getting underneath the side cap.

18. The normal useful life of piles has never been satisfactorily established but, for purposes of estimation, it is generally regarded as twenty years though they may last for a very much longer period of time.

One witness roughly estimated that of the 6,000 or 7,000 piles under the pier not

over twenty-five percent had been replaced since the pier was built in 1915.

19. About the time the Navy vacated the premises, a representative of the Navy, Charles K. Paul, an attorney in charge of real-estate work in the Third Naval District, and Commissioner Reinicke, a representative of the Department of Marine and Aviation of the City of New York, discussed the procedure to be followed in ascertaining the extent of any damage for which the Navy may have been responsible. Commissioner Reinicke suggested that a joint survey of the premises be made, but Mr. Paul objected to a joint survey because he believed that neither his office nor Commissioner Reinicke's office had available personnel who were qualified to determine the question of responsibility for any damage.

Commissioner Reinicke then suggested that the survey be made with a view to determining the condition of the premises so that the question of responsibility might later be determined. With that suggestion Mr. Paul agreed.

20. Approximately nine months prior to the time the Navy vacated the premises (during 1945) engineers employed by the plaintiff had completed a survey of the condition of the pier. A copy of that survey was brought up to date by simply dating the report October 4, 1946, and was thereafter delivered to representatives of the Navy Department who checked the report in the field with the understanding that, if the conditions noted in the report still obtained, the report would be accepted as a condition survey.

21. After the defendant had made its inspection it was agreed by representatives of the plaintiff and the defendant that the condition of the pier, as set forth in detail in such report, represented the physical condition of the premises as of October 1946. The parties did not attempt any determination as to liability for any damages.

22. The condition report of the pier or so-called "joint survey" is made up of the following items:

1. 148 line piles to be renewed.
2. 782 interior bearing piles to be posted.
3. 43 brace piles to be renewed.
4. 50 fender piles to be renewed.
5. 150 linear feet of side caps to be renewed.
6. 350 linear feet of cross clamps to be renewed.
7. 180 linear feet of horizontal braces to be renewed.
8. 2,200 linear feet of side and shed rangers to be renewed.
9. 1,500 linear feet of fender caps to be renewed.
10. 50 linear feet of fender chocks to be renewed.
11. 9 single bitts to be reset.
12. 10 single bitts to be renewed.
13. 166 shed doors (Turnover) to be repaired.
14. 326 weather plates to be renewed.
15. 3 cargo masts to be renewed.
16. 2 cargo masts to be realigned.
17. 412,400 square feet interior and exterior of sheds to be painted.
18. 100 square yards asphalt pavement to be repaired.
19. 750 square yards office linoleum to be replaced.
20. 1,500 square feet metal ceiling to be renewed.
21. 30 linear feet of metal ceiling cornice to be renewed.
22. 20 wire skylight glass lights to be renewed.
23. 336 skylights to be painted.
24. 1 rolling shutter door to be renewed.
25. 3 rolling shutter doors to be repaired.
26. 230 square feet corrugated sheet metal to be renewed.
27. 80 linear feet window sill metal flashings to be renewed.
28. 3 column base plates to be renewed.
29. 1 flag pole to be renewed.
30. Roof slag to be cleaned from gutters and leaders.
31. 3,400 linear feet track rails on north side to be cleared of asphalt.

23. The "Murray" or "joint survey" describing in great detail the repairs to be made, is in evidence as Plaintiff's Exhibit No. 7, and is made a part hereof by reference. It is not copied in this report due to its great length. The "Murray Report" is generally termed the "Survey Report."

This survey was made for the plaintiff by Frank J. Murray, an experienced dock builder. His examination continued daily for a period of one month and was thorough, consisting in part of testing the piles with pike and hammer. Out of 6,000 or 7,000 piles he found approximately 1,000 needing reposting or renewal, as set forth in his report. He found only 3 or 4 broken, probably from collisions.

24. Mr. Francis H. Weidler, the defendant's structural engineer at the New York Navy Yard, on or about February 1, 1947, made an inspection covering the first 10 items set forth in the list of repairs in Finding No. 22. Mr. Weidler spent the day at the pier but the inspection covered a period of approximately two hours and consisted of riding around the bottom of the pier in a small boat making observations as to visible damages to the piling and fender structure of the pier. Mr. Weidler believed from his general observation of the piling that it was in an advanced state of rot but he did not, in any manner, test any of the piling to ascertain the extent of the visible rot. Mr. Weidler made no report as to the extent of the rot.

The evidence is insufficient to show the extent of rot or damage to the portions of the pier as set out in the first ten items in Finding 22.

25. The inspection of the superstructure of the pier was made for the defendant by Mr. Max Van Dyke, a competent engineer, employed at the New York Naval Shipyard. He spent two days about the middle of February 1947 making an inspection of items 11 to 31, inclusive, of this claim. His inspection did not include the first ten items of the report, which related to the substructure of the pier.

26. The evidence is conflicting as to whether the estimated cost of the list of repairs as calculated by plaintiff's engineers and submitted to defendant's representatives at that time was agreed to by the latter as being fair and reasonable.

27. Thereafter the condition report, showing the cost of the necessary repairs as calculated by plaintiff, was submitted to the Navy Department with request for payment of the total of the estimated cost, $142,740.00, as follows:

```
 1. Line piles to be renewed, 148 at $110.... $16,280.00
 2. Int. bearing piles to be posted, 782 at $80 62,560.00
 3. Brace piles to be renewed, 43 at $100.... 4,300.00
 -----------
 83,140.00
```

Assuming the life of the piles contained in items 1 to 3 inc. to be 20 years, it is felt reasonable to ask ¼ of the amount estimated in view of the fact that the Navy held this pier for 5 years:

```
 ¼ of $83,140.00 .............................. 20,785.00
 4. Fender piles to be renewed, 50 at $100.. 5,000.00
 5. Side cap to be renewed, 1,800 f. b. m. at
 $480 .....................................¹ 8,640.00
 6. Cross clamps, to be renewed, 2,100 f. b.
 m. at $520............................... 1,092.00
 7. Hor. braces to be renewed, 750 f. b. m.
 at $520 ................................. 390.00
 8. Side & Shed rangers to be renewed, 22,-
 000 f. b. m. at $480..................... 10,560.00
 9. Fender cap to be renewed, 15,000 f. b.
 m. at $480............................... 7,200.00
10. Fender chock to be renewed, 500 f. b. m.
 at $480 ................................. 240.00
11. Single bitts to be reset, 9 at $200........ 1,800.00
12. Single bitts to be renewed, 10 at $280.... 2,800.00
13. Shed doors (Turnover) to be repaired,
 166 at $240 each ........................ 39,840.00
 Based on 4% Maintenance per year.
 Tenancy was for a period of five years,
 thus giving a reasonable maintenance
 percentage of 20% applied against the
 cost of $1,200 per door.
14. Weather plates to be renewed, 326 at
 $10 each ................................ 3,260.00
15. Cargo Masts to be renewed, 3 at $600
 each .................................... 1,800.00
16. Cargo Masts to be realigned, 2 at $400
 each .................................... 800.00
17. Int. & Ext. of shed to be painted, 412,-
 400 sq. ft. at 6¢ ....................... 24,744.00
 Ext.: 1,720 x 25 x 2......... 86,000 sq. ft.
 140 x 30 x 2......... 8,400
 ---------------
 94,400 sq. ft.
 Int.: 1,720 x 140.............240,800
 140 x 30 x 2......... 8,400
 1,720 x 20 x 2......... 68,800
 ---------------
 318,000 sq. ft.
 Total area to be painted=412,400
 sq. ft.
18. Asphalt pavement to be repaired, 100
 sq. yds. at $3.00......................... 300.00
19. Office linoleum to be replaced, 750 sq.
 yds. at $3.50 ........................... 2,625.00
20. Metal ceiling to be renewed, 1,500 sq.
 ft. at 80¢ .............................. 1,200.00
21. Metal ceiling cornice to be renewed, 30
 lin. ft. at $1.50......................... 45.00
22. Wire skylight glass lights to be re-
 newed, 20 at $4.50....................... 90.00
23. Skylights to be painted, 336 at $5.00..... 1,680.00
24. Rolling shutter door to be renewed, 1
 at $630 ................................. 630.00
```

¹ Should be $864.00.

813

25. Rolling shutter door to be repaired, 3 at $300 .......................... 900.00
26. Corr. sheet metal to be renewed, 230 sq. ft. at 80¢ ........................... 184.00
27. Window sill met. flashing to be renewed, 80 lin. ft. at $1.00............. 80.00
28. Column base plates to be renewed, 3 at $35 .................................. 105.00
29. Flag pole to be renewed, 1 at $100....... 100.00
30. Roof slag to be cleaned from gutters & leaders ................................. 750.00
31. Track rails on north side to be cleared of asphalt, 3,400 lin. ft. at $1.50....... 5,100.00

Total ............................. 142,740.00

28. The defendant admits liability for the following items at the costs listed:

*Restoration estimated cost*

32. Replace 100 lin. ft. of damaged fender caps (Item No. 9)........................ $1,000.00
33. Renew damaged fender chock (Item No. 10) ................................ 250.00
34. Reset 2 single bits (Item No. 11)........ 180.00
35. Replace 10 damaged bitts (Item No. 12).. 1,800.00
36. Repair damaged cargo masts (Item No. 15) ................................. 1,800.00
37. Realign damaged cargo masts (Item No. 16) ................................. 800.00
38. Asphalt pavement to be repaired (Item No. 18) ................................ 300.00
39. Repair office linoleum damaged by removal of partition (Item No. 19)....... 700.00
40. Repair metal ceiling damaged by removal of partition (Item No. 20)....... 300.00
41. Wire skylight glass to be renewed (Item No. 22)........................... 90.00
42. Repair damaged rolling shutter doors (Items No. 24 and No. 25)............. 1,000.00
43. Repair damaged column base plates (Item No. 28) ......................... 150.00
44. Remove asphalt paving from rails on North Side track (Item No. 31)........ 1,700.00
45. Replace damaged metal ceiling cornice (Item No. 21) .......................... 45 00

Total ............................. 10,115.00

(The foregoing items are included in Findings No. 27 and No. 29 and are considered there.)

29. We find the following facts in reference to the items claimed by the plaintiff:

*Items Nos. 1 to 4 inclusive*

Item No. 1. Plaintiff claims 148 line piles to be renewed at $110.00, amounting to $16,280.00.

Item No. 2. Plaintiff claims 782 interior bearing piles to be posted at $80.00, amounting to $62,560.00.

Item No. 3. Plaintiff claims 43 brace piles to be renewed at $100.00, amounting to $4,300.00.

Plaintiff claims the total cost of renewing piles under Items 1 to 3, inclusive, is $83,140.00.

Plaintiff contends that the useful life of the piles enumerated in Items Nos. 1, 2, and 3, inclusive, is 20 years and in view of defendant's occupation of the premises for 5 years, it is charged for one-fourth of the total sum of $83,140.00, or $20,785.00.

Item No. 4. Plaintiff claims 50 fender piles to be renewed at $100.00, a total of $5,000.00.

The evidence is insufficient to show the number of piles which became rotten during the five-year period of the Government's tenancy, or the extent to which the piles, or any particular pile, rotted during that period.

During the period from 1915, the date the pier was constructed, to 1942, when the Government's tenancy began, approximately 25 percent of the original 6,800 piles, or about 1,700 piles, were replaced.

*Item No. 5*

Item No. 5. Plaintiff claims 1,800 side caps (150 linear feet) to be renewed at a total of $864.00.

1,800 f. b. m. or 150 linear feet were all rotten and needed to be renewed. The age of the timber is unknown and it is not possible to tell at what time the rotten condition began. It is probably due to wear and tear on account of age.

The fair and reasonable cost of renewing 1,800 f. b. m. is $480.00 per M or...... $864.00

*Item No. 6*

Item No. 6. Plaintiff claims cross clamps to be renewed, 2,100 f. b. m. at $520 per M, a total of $1,092.00.

The cross clamps (12 x 12 timber) run crosswise on the pier and rest on the side cap. They were rotted at their ends amounting to 350 linear feet at different locations.

There is no proof as to their condition at any other date. The rotted ends were doubtless ordinary wear and tear. The reasonable cost for 350 linear feet or 2,100 f. b. m. is the sum of...................... $1,092.00

*Item No. 7*

Item No. 7. Plaintiff claims horizontal braces to be renewed, 750 f. b. m. at $520.00 per M, a total of $390.00.

180 linear feet of these braces were missing.

There is no proof as to the length of time these braces had been missing. Doubtless the condition was due to ordinary wear and tear. The fair and reasonable cost for 180 linear feet or 750 f. b. m. at $520.00 per M is.................... $390.00

*Item No. 8*

Item No. 8. Plaintiff claims 22,000 f. b. m. side and shed rangers to be renewed at $480.00 per M., a total of $10,560.00.

The rangers were badly worn and rotted. Their age is not known nor is the length of time that this condition has existed. The condition is probably due to wear and tear from age.

The fair and reasonable cost of renewal at $480.00 per M is........................ $10,560.00

*Item No. 9*

Item No. 9. Plaintiff claims fender cap to be renewed—15,000 f. b. m. at $480.00 per M, a total of $7,200.00.

A fender cap is a timber resting on top of fender piling and serves to hold the fender piling in place; 1,500 linear feet were worn and rotted. There is no proof as to the length of time that this condition had obtained, but it was evidently

due to age or wear and tear. Defendant admits liability to replace 100 linear feet of damaged fender caps in the amount of (See Item No. 32 of Finding No. 28.) ... $1,000.00

In addition there is proof that approximately 100 linear feet of fender cap had been broken, "evidently smashed."

The reasonable cost for renewal of this 100 linear feet (equivalent to 1,000 f. b. m.) at $480 per M. amounts to ... $480.00

## Item No. 10

*Item No. 10.* Plaintiff claims fender chock to be renewed, 500 f. b. m. at $480 per M., a total of $240.00.

50 linear feet were missing. Defendant admits liability for this item, 500 f. b. m. at $480 per M ... $240.00

## Item No. 11

*Item No. 11.* Plaintiff claims 9 single bitts to be reset at $200.00, a total of $1,800.00. Defendant admits liability for 5 bitts at $90.00 each or $450.00.

According to the Murray Report which defendant conceded to show the condition as of October 4, 1946, there were 9 bitts to be reset.

The fair and reasonable cost to set 9 bitts at $90.00 each is the sum of ... $810.00

## Item No. 12

*Item No. 12.* Plaintiff claims 10 single bitts at $280.00 each, a total of $2,800.

Defendant admits liability for 10 damaged bitts at $180.00 each, or $1,800.00.

The fair and reasonable cost of renewing the 10 bitts is $180.00 each or ... $1,800.00

## Item No. 13

*Item No. 13.* Plaintiff claims 166 shed doors (Turnover) to be repaired at $240.00 each, a total of $39,840, based upon a 4 percent maintenance per year. The tenancy being 5 years, the defendant is charged 20 percent of a total cost of $1,200.00 per door.

Approximately 82 doors appeared to be in sound condition except for corrosion, and 83 doors needed a number of repairs due to the fact that some of the doors jammed, or were sprung, or had broken weight chains and gears out of order. Other doors were blocked on account of a crib or did not tilt. There is no satisfactory evidence as to the actual cost of needed repairs to each of these doors.

In the use made of the pier by Luckenbach, the sound condition and ready usability of the doors is necessary for its business and they were maintained in generally sound condition. Approximately 83 doors were in need of certain repairs, due to defendant's usage, when defendant vacated the pier.

The defendant constantly kept employed two men to grease the rolling doors, and a crew of men to take care of general maintenance.

The cost of repairing the 83 doors, which needed repair by reason of defendant's tenancy, on the basis of plaintiff's figure of $240.00 per door, amounts to ... $19,920.00

## Item No. 14

*Item No. 14.* Plaintiff claims 326 weather plates to be renewed at $10.00 each, a total of $3,260.00.

Weather plates are riveted to sides of shed columns and act as guides to door rollers. The plates at the bottoms are corroded from 6″ to 1′ at both sides inshore and outshore of shed columns.

The doors and plates were in good condition at the beginning of defendant's tenancy.

The fair and reasonable cost for repairs to the 326 plates at $2.00 per plate is ... $652.00

## Item No. 15

*Item No. 15.* Plaintiff claims 2 cargo masts to be renewed at $600.00 each, a total of $1,800.00.

The defendant admits liability for this item in the amount of ... $1,800.00

## Item No. 16

*Item No. 16.* Plaintiff claims 2 cargo masts to be realigned at $400.00 each, a total of $800.00.

Defendant admits liability for this item at cost of ... $800.00

## Item No. 17

*Item No. 17.* Plaintiff claims painting interior and exterior of shed—412,400 sq. ft. at 6 cents, a total of $24,744.00.

While there is some conflict in the evidence, it appears that when defendant began its tenancy the paint condition was not good. Defendant did some painting and the evidence indicates that the property was reasonably well maintained in this respect. The condition of the paint was about the same at the end of defendant's tenancy as at the beginning, and defendant denies liability as to this item. The fair and reasonable cost of painting of both interior and exterior of the shed at 6 cents per sq. ft. for 412,400 sq. ft. is .. $24,744.00

## Item No. 18

*Item No. 18.* Plaintiff claims 100 sq. yds. asphalt pavement to be repaired at $3.00 per sq. ft., a total of $300.00.

The defendant admits liability for this item. The fair and reasonable cost is ... $300.00

## Item No. 19

*Item No. 19.* Plaintiff claims 750 sq. yds. office linoleum to be replaced at $3.50 per sq. yd., a total of $2,625.00.

Defendant installed approximately 150 sq. yds. of linoleum in the downstairs office of the pier shed. The linoleum in the downstairs office and in the second floor office was in almost as good condition on October 15, 1946, except for ordinary wear and tear, as it was when the defendant commenced occupancy. The defendant admits liability for about 25 percent of the claim based upon the estimated damage caused by lines in the linoleum which were left after the removal of partitions, or $700.00. The amount of damage shown by the joint survey, and which was agreed upon, was 750 sq. yds. The fair and reasonable cost of replacement is the sum of ... $2,625.00

#### Item No. 20

*Item No. 20.* Plaintiff claims 1,500 sq. ft. of metal ceiling to be renewed at $0.80 per sq. ft., a total of $1,200.00.

The defendant admits liability for only 25 percent of this claim, or $300 00.

The fair and reasonable cost for this work is ..................................... $1,200.00

#### Item No. 21

*Item No. 21.* Plaintiff claims 30 ft. metal ceiling cornice to be renewed at $1.50 per linear foot, a total of $45.00.

Defendant admits liability for this item. The fair and reasonable price for renewing 30 ft. metal ceiling cornice is ......... $45.00

#### Item No. 22

*Item No. 22.* Plaintiff claims 20 wire skylight glass lights to be renewed at $4.50 each, a total of $90.00.

Defendant admits liability for this item. The fair and reasonable cost for renewing 20 wire skylight glass lights is $90.00

#### Item No. 23

*Item No. 23.* Plaintiff claims 336 skylights to be painted at $5.00 each, a total of $1,680.00.

The condition of the paint on the skylights on October 15, 1946, was similar to the condition of the paint on the shed proper. The skylights were well preserved. The defendant disclaims liability. The skylights were reasonably well maintained by the defendant. The fair and reasonable cost of painting the 336 skylights is ............................... $672.00

#### Item No. 24

*Item No. 24.* Plaintiff claims 1 shutter door to be renewed at $630.

The south door on the outshore end of the pier was damaged. The plaintiff claims it required renewal.

The evidence shows that this door was corroded at its north edge to 6 feet from the ground. The defendant admits that the damaged portion plus a missing pulley should be repaired and replaced. The fair and reasonable cost for making the repair is ..................................... $450.00

#### Item No. 25

*Item No. 25.*—Plaintiff claims 3 rolling shutter doors to be renewed at $300.00 each, a total of $900.00.

Defendant admits liability as to $550.00 only on this item.

The fair and reasonable cost of repairing the three rolling shutter doors is ..... $900.00

#### Item No. 26

*Item No. 26.*—Plaintiff claims 230 sq. feet corrugated sheet metal to be renewed at $0.80 per sq. foot, a total of $184.00.

The fair and reasonable cost for renewing 230 sq. feet of corrugated sheet metal is $0.40 per sq. ft. or........................ $92.00

#### Item No. 27

*Item No. 27.*—Plaintiff claims 80 linear feet of window sill metal flashings to be renewed at $1.00 per foot, a total of $80.00.

The evidence shows that the corrosion was far advanced and probably existed prior to the defendant's tenancy. It is not possible to ascertain what portion of the cost of this corrosion is due to defendant's usage during its tenancy.

The fair and reasonable cost at $1.00 per linear foot for this renewal is........ $80.00

#### Item No. 28

*Item No. 28.* Plaintiff claims 3 column base plates to be renewed at $35.00 each, a total of $105.00

The damage to these plates was not the result of ordinary usage.

The fair and reasonable cost for renewing the plates is ...................... $105.00

#### Item No. 29

*Item No. 29.* Plaintiff claims 1 flag pole to be renewed at a cost of $100.00.

The flag pole was splintered, evidently by the elements. It is not shown that any act of defendant caused this damage.

The fair and reasonable cost of renewing the flag pole is .................... $100.00

#### Item No. 30

*Item No. 30.* Plaintiff claims roof slag to be cleaned from gutters and leaders at a cost of $750.00.

The evidence is insufficient to show how this condition occurred, or as to the amount of work required to clear the gutters.

The fair and reasonable cost for cleaning roof slag from gutters and leaders is ........................................... $750.00

#### Item No. 31

*Item No. 31.* Plaintiff claims cleaning track rails of asphalt on the north side—3,400 linear feet at $1.50 per linear foot, a total of $5.100.00.

The defendant admits liability.

The fair and reasonable price for removal of the asphalt from the track rails is $0.50 per linear foot, a total of.......... $1,700.00

30. The Luckenbach Steamship Company, the tenant of the pier from the date it was built until defendant became its occupant, made repairs during 1939 to 1941, including certain repairs to substructure and fender system, amounting to $141,000. A new roof was installed costing $46,000; and the skylight repairs cost $8,000. There is no proof as to the number of piles that were posted, if any.

It was the practice of the Luckenbach Company to accumulate repairs by waiting until an amount sufficient to be economically interesting to a contractor had accumulated. Each year there was a certain amount of repairs. A maintenance crew was employed and repairs and painting were constantly carried on.

31. The defendant, during its occupancy of the 35th Street Pier, made the following repairs and improvements to the premises at its own cost and expense as set forth below, a considerable portion being improvements for defendant's own convenience.

| | Improvements and repairs cost |
|---|---|
| 1. Furnish and install double mooring bitts | $1,673.55 |
| 2. Raising RR track on S. S. of pier | 2,436.55 |
| 3. Repair damage at S. W. corner | 2,381.52 |
| 4. Repair damaged sea wall | 2,075.00 |
| 5. Repair and overhaul· damaged cargo doors | 2,860.00 |
| 6. Repair damaged sub-structure | 573.91 |
| 7. Frost proofing valves | 155.00 |
| 8. Repair and paint overhead door No. 59.. | 607.94 |
| 9. Regrading RR tracks—2nd Ave.—Marginal St. | 1,229.24 |
| 10. Cover valves and piping at fire stations 2, 6, 8 | 81.51 |
| 11. New check valves on F. W. outlets | 386.17 |
| 12. Repair and adjustment to 22 doors | 894.46 |
| 13. Covering water lines, gates and check valves | 311.26 |
| 14. Raising of RR track and restoring in operating condition—Investigation | 125.42 |
| 15. Repairs to roof | 640.00 |
| 16. Fresh water ship connections | 1,033.34 |
| 17. Dredging at foot of pier | 55,528.63 |
| 18. Repairs to windows, doors, and floors; erection of shower stalls; making and installing window screens | 455.25 |
| 19. Erecting materials Supply Room | 405.00 |
| 20. Erecting sub-dividing partition for British War Ministry | 340.00 |
| 21. Partitions for classroom (bridge control) and Projection Room | 1,183.25 |
| 22. Ladies rest room (upper deck) | 133.90 |
| 22. Ladies rest room (upper deck) | 133.90 |
| 23. Cribs for storage purposes; using salvaged materials | 540.00 |
| 24. Lunch room, repairs to doors, windows, floors; installing lunch counters and adjoining store room | 220.00 |
| 25. Labor and Transportation office; railing, window vent bracket with glass, miscellaneous repairs | 219.00 |
| 26. Partitions for service to ships afloat, repairing doors and floors and installing screens | 235.50 |
| 27. Erection Work Shop for electricians | 171.85 |
| 28. Erection cage for storage of equipment.. | 688.50 |
| 29. Erection office and store room for British War Ministry | 200.50 |
| 30. Alterations·to Men's room | 85.00 |
| 31. Erection partitions for British War Ministry | 4,886.00 |
| Total | 82,757.25 |

32. The defendant abandoned all structures and alterations erected by it when it surrendered possession of the demised premises on October 15, 1946.

33. The usual practice in New York Harbor was for the tenant to make all repairs to the pier, whether under a lease or a permit.

34. The pier was used by defendant primarily for ordinary pier purposes and also for storage.

35. Throughout the occupancy by the defendant, the premises were under the jurisdiction of the Supply Department of the New York Naval Shipyard. During that time defendant kept a considerable force of technicians and laborers for maintenance and repair purposes to the buildings in the general area of this pier. The defendant undertook to keep up maintenance of this pier during the period of its occupancy. A crew was kept at the pier for minor repairs.

### Conclusion of Law

Upon the foregoing special findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiff is entitled to recover, and it is therefore adjudged and ordered that it recover of and from the United States thirty-three thousand twenty-eight dollars and sixty cents ($33,028.60).

Alfred Selter, New York City, for plaintiff. John P. McGrath and Harry E. O'Donnell, New York City, on the briefs.

Herbert Pittle, Washington, D. C., with whom was Asst. Atty. Gen. A. Devitt Vanech, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

JONES, Chief Judge.

On November 12, 1941 the plaintiff leased to the defendant approximately 225,000 square feet of space on the City Pier in Brooklyn, New York. The agreement was in writing and provided for a term commencing November 16, 1941 and ending June 30, 1942. The annual rental was to be $119,000.

This lease agreement was renewed from year to year by extensions and renewals until October 15, 1946. Some slight changes were made in the property included. Aft-

er November 16, 1942 the annual rental rate was $107,000. It was stipulated in the lease contract that the property was leased and the rental based on an "as is" basis. The pier was used by the defendant primarily for ordinary pier purposes and also for storage.

The premises were returned to the custody of the plaintiff on October 15, 1946.

The plaintiff sues for $142,740, which it claims is the amount necessary to repair and restore the property. The defendant admits liability to the extent of $10,115.

The evidence shows that it was the general practice of the City of New York in leasing its piers to insert in its permit contracts a provision requiring the lessee to make all repairs. However, as a general rule, the defendant, in leasing piers from plaintiff, refused to yield to this contention of the city and refused to agree to make such repairs. Neither the leases nor the renewal agreements in this case contain any provision whatever with respect to repairs during the period of occupancy by the United States.

The evidence is that at the time of the commencement of occupancy the piers and structures were in tenantable condition for the purposes for which leased, but the actual detailed physical condition of the pier, especially the understructure, at the date of the beginning of the lease, is not shown.

The pier was built in 1915. Its structure consisted of wooden piles, cross clamps and side-cap rangers with a concrete deck. It was supported by 6,800 wooden piles. A one-story shed having 166 overhead doors and four rolling shutter doors covered most of the deck.

The piles are generally considered good for twenty years, though they may last for a much longer period of time. It was estimated that about 25 percent of the piling under the pier had been replaced during the years after the pier was built in 1915.

About nine months prior to the time of the final ending of the lease period, engineers employed by the plaintiff completed a survey of the condition of the pier. A copy of that survey was brought up to date by simply dating the report October 4, 1946.

Soon thereafter a copy was delivered to representatives of the Navy Department with the understanding that, if the condition noted in the report still obtained, it would be accepted as a condition survey. The defendant made an inspection and it was agreed by representatives of both parties that the condition of the pier as set forth in detail in such report represented the condition of the premises as of October 1946. No attempt was made at that time by the parties to determine liability for any damages. The details of that report are set out in Finding 22.

A brief survey was made by two of defendant's structural engineers in the early part of 1947. One of them reported that the piling was in an advanced state of rot, but he did not report as to details.

There is a conflict in the testimony as to whether or not the cost of repairs, as determined by plaintiff's engineers, was agreed to by defendant's representatives, the plaintiff claiming the affirmative and the defendant denying that there were any agreements as to the cost estimates set out in the report. These figures are set out in detail in Finding 27 and total $142,740. The items on which defendant admits liability are set out in Finding 28. The total of such items is $10,115.

The permit contract which was signed by the company which had this property under lease for a number of years prior to defendant's occupancy contained the following provision:

"And the said party of the second part hereby covenants and agrees that it will, at its own sole cost and expense, at all times during the continuance of this license or permit, maintain the superstructure of said wharf property and the structures thereon, including decking, sheathing, backing logs, fender system, clusters or other fender piles, vertical sheathing and mooring posts or bitts, in good and sufficient repair and condition and well painted."

This provision was not included in the lease contract signed by defendant and plaintiff in the instant case.

The plaintiff contends that under the New York law the tenant, in the absence of

a covenant to the contrary, must make all repairs to the leased property, and that it was customary for tenants in New York Harbor to bear the expense of making all repairs to such structures. It cites cases which do not bear out that contention, but upon the whole seem to apply the principles laid down in Taylor's Landlord and Tenant (7th Ed., p. 292), from which we quote:

"Independently of any express agreement on the part of a tenant, and in the absence of the landlord's undertaking to keep the premises in repair, the law imposes upon every tenant, whether for life or for years, an obligation to treat the premises in such a manner, that no substantial injury shall be done to them; and so, that they may revert to the lessor at the end of the term, unimpaired by any willful or negligent conduct on his part. A tenant for years, or from year to year, must therefore keep the premises wind and water tight; and is bound to make fair and tenantable repairs, such as the keeping of fences in order, or replacing doors and windows that are broken, during his occupation. If it is a furnished house, he must take care of the furniture, and leave it with the linen, etc., clean and in good order. But he is not bound to rebuild premises which have accidentally become ruinous during his occupation, unless he is under a covenant to rebuild. Neither is he liable for the ordinary wear and tear of the premises; nor answerable if they are accidentally burnt down; nor bound to rebuild a fallen chimney; or replace doors and sashes worn out by time; to put a new roof on the building; or to make similar substantial and lasting repairs, such as are usually called general repairs. Nor is he bound to do painting, whitewashing, or papering, which are mere matters of ornament (unless they are necessary to preserve exposed timber from decay), even though he be under a covenant to leave the premises 'in good and sufficient repair, order, and condition.'"

The defendant takes the position that in the absence of an express agreement the tenant is not obligated to repair generally, his implied obligation being only to make such repairs as are necessary to keep the property in tenantable condition, but not to make more than ordinary repairs; that it does not require him to make extensive, substantial, or lasting repairs and replacements. It claims that the New York law does not apply to contracts with the Government, but that if it be held to apply, it is in fact substantially the same as the general law on that subject.

Both sides cite Suydam v. Jackson, 54 N.Y. 450.

The plaintiff quotes from page 453 the following: "At common law the lessor was, without express covenant to that effect, under no obligation to repair, and if the demised premises became, during the term, wholly untenantable by destruction thereof by fire, flood, tempest or otherwise, the lessee still remained liable for the rent unless exempted from such liability by some express covenant in his lease. * * * but the lessee was under an implied covenant, from his relation to his landlord, to make what are called 'tenantable repairs.'"

The defendant quotes from page 454 of the same opinion as follows: "The lessee was not bound to make substantial, lasting or general repairs, but only such ordinary repairs as were necessary to prevent waste and decay of the premises. If a window in a dwelling should blow in, the tenant could not permit it to remain out and the storms to beat in and greatly injure the premises without liability for permissive waste; * * *."

 From an examination of the authorities we have concluded that the New York law is not substantially different from the general law on this subject, to wit, that a non-convenanting tenant is liable for such repairs as are necessary to preserve the property but not for substantial repairs or rebuilding necessitated by the ordinary process of wear and tear. Later expressions from New York courts indicate, in fact, that it is not different. See May v. Gillis, 169 N.Y. 330, 62 N.E. 385; Herold v. Geroux, Sup.App.T., 71 N.Y.S.2d 848.

 It has been repeatedly held by this and other courts that where the lease contract specifically requires the tenant to keep the premises in good repair the only obligation is to return the property in substantial-

ly the same condition as it was at the beginning of the tenancy, ordinary wear and tear excepted. Brooklyn Waterfront Terminal Corp. v. United States, 90 F.Supp. 943, 117 Ct.Cl. 62. Smith v. United States, 96 Ct.Cl. 326. These provisions which are normally included in rental contracts are the result of experiences and trade practices and are usually based on what are regarded as the normal obligations between lessor and lessee. In a number of the cases cited by both parties additional obligations are placed on the landlord or the tenant or both where additional obligations are spelled out. These special contract provisions, of course, may vary the requirements that are ordinarily placed upon the respective parties.

██ In this case there is no spelling out of the obligations as to who is to make the repairs or what repairs are to be made. We must examine the facts in the case as to what repairs are required to keep the property in tenantable condition. United States v. Bostwick, 94 U.S. 53, 24 L.Ed. 65. Manifestly, there would be no obligation to completely rebuild a pier much of which had deteriorated considerably before the term of the lease began. On the other hand, there can be no doubt of the obligation to make such repairs as might be necessary to keep the property in tenantable condition and to prevent waste and to compensate for any damages due to neglect and to prevent waste in excess of ordinary wear and tear.

During the period of the occupancy by the defendant a number of repairs and improvements were made by the defendant at its own cost and expense. These items are set out in detail in Finding 31. The total of such expenditures as set out in that finding is $82,757.25. The defendant abandoned all structures, alterations and improvements made by it when it surrendered the premises on October 18, 1946. During the period of occupancy the defendant kept a considerable force of technicians and laborers for the purpose of maintaining and repairing this pier and other buildings which it controlled in that general area. During the period 1939 to 1941 the previous tenant had made repairs and replacements at a total cost of $141,000, but the company

superintendent testified that this represented accumulated needs.

██ We have set out in detail in our Finding 29 our ultimate findings in respect to the various items claimed by the plaintiff. Except as otherwise indicated replacement and repair costs are determined as of the time of the termination of defendant's occupancy.

### Items Nos. 1 to 4, inclusive

These items relate to replacements of the piles. Of the 6,800 piles that had been placed in the structure in 1915, 1,700 had been replaced prior to defendant's occupancy. The average cost of such replacement was $86.15 per pile. However, these piles, with the exception of replacements, had been in service 27 years at the beginning of the defendant's lease period and had, therefore, been in use longer than what was regarded as the average life of wooden piling. We think, therefore, that the obligation of replacement generally should not be placed upon the defendant. Four of these piles had been broken during defendant's occupancy, evidently by collision. The defendant should pay for replacement of these broken piles. The cost of such replacement was $344.60.

### Items Nos. 5 to 8, inclusive.

For the reasons stated in our findings, we do not regard the defendant as obligated to compensate for these items.

### Item No. 9

This item covers the claim of $7,200 for renewal of fender cap material. Much of this was worn and rotting. There is no proof as to the length of time this condition had existed. There is evidence that about 100 linear feet had been broken, "evidently smashed." The renewal cost of this 100 feet at that time would have been $480, which is allowed.

The defendant also admits liability for damaged fender caps in the amount of $1,000.

### Item No. 10

The defendant admits liability for 50 linear feet of fender chock which were

missing and which were required to be replaced. The amount for such replacement is $240.

### Item No. 11

Under Item 11 the defendant admits liability for 9 single bitts which were required to be reset, the fair and reasonable cost of which is $810.

### Item No. 12

Defendant admits liability for 10 damaged bitts, the reasonable cost of the renewal of which is $1,800.

### Item No. 13

Under this item plaintiff claims a total of $39,840 based upon a four percent maintenance per year. There were 166 of these shed doors. According to the evidence, 82 of these doors seemed to be in sound condition at the end of the lease period except for ordinary corrosion. Eighty-three doors needed repairs due to the fact that some of them jammed or were sprung or had broken weight chains and gears out of order. Other doors among the 83 needing more than ordinary repairs were blocked on account of a crib, or did not tilt. The reasonable cost of repairing the 83 doors which needed repair by reason of defendant's tenancy amounts to $19,920.

### Item No. 14

Under this item plaintiff claims 326 weather plates which it says were renewed at a cost of $3,260 or $10 each. The evidence clearly shows that the doors and plates were in good condition at the beginning of defendant's tenancy. The fair and reasonable cost of repairs to the 326 plates was $2 per plate, a total of $652.

### Item No. 15

Defendant admits liability for 3 cargo masts which were required to be renewed at $600 each, a total of $1,800.

Defendant also admits liability for 2 cargo masts which had to be realigned at $400 each, or a total of $800.

### Item No. 17

The plaintiff claims $24,744 for painting the interior and exterior of the shed, a total of 412,400 square feet. The evidence is conflicting on this item, but the indications are that the paint was not in good shape at the time defendant began its occupancy. It did some painting during this period, and the weight of the evidence establishes that the paint was in about the same condition at the end as at the beginning of the tenancy period. We make no allowance for this item.

### Item No. 18

Defendant admits liability for 100 square yards of asphalt pavement repaired at a cost of $300.

### Item No. 19.

Plaintiff claims the value of 750 square yards of office linoleum which was replaced at a cost of $3.50 per square yard, or a total of $2,625. During the period of its tenancy, however, the defendant replaced about 150 square yards of linoleum and the remaining part was in almost as good condition at the end of the lease period as it was at the beginning with the exception of ordinary wear and tear. The defendant admits liability for 25 percent of the claim based upon the estimated damage caused by lines in the linoleum which were left after the removal of the partitions, or a total of $700. We regard this as a fair admission and find on this item for the plaintiff in the sum of $700.

### Item No. 20

Plaintiff claims that 1,500 square feet of metal ceiling were renewed at 80 cents per square foot, a total of $1,200. The defendant admits liability for $300. We find that defendant should be charged with renewal cost on this item in the sum of $800.

### Item No. 21

There is no controversy about Item 21 involving metal ceiling cornice. Defendant admits liability for the renewal cost of $45, which is the amount of plaintiff's claim.

### Item No. 22

Defendant admits liability for Item 22 in the amount of plaintiff's claim for the renewal of 20 wire skylight glass lights at a cost of $90.

## Item No. 23

This item is for painting 336 skylights at $5 each, a total of $1,680. Our comments in rejecting the pending claim under Item No. 17 are applicable to this item, and this claim is rejected.

## Item No. 24

The defendant admits liability under Item No. 24 for the renewal cost of one shutter door for which plaintiff claims $630. The defendant's admission, however, goes only to the extent of renewing the damaged portion plus the replacement of a missing pulley. We find the fair and reasonable cost for making the repair is $450.

## Item No. 25

Under this item plaintiff claims the renewal cost of 3 rolling shutter doors at $300 each, a total of $900. The defendant admits liability as to $550 on this item. We find that the fair and reasonable cost of repairing the 3 rolling shutter doors is $900.

## Item No. 26

On this item plaintiff claims the cost of 230 square feet of corrugated sheet metal renewed at 80 cents per square foot, or a total of $184. We find that the fair and reasonable cost for such renewal is 40 cents per square foot, or $92, which amount is allowed.

## Item No. 27

Under this item plaintiff claims the renewal cost of 80 linear feet of window sill metal flashings at $1 per foot, or a total of $80. The evidence indicates that the corrosion was far advanced and probably existed prior to the defendant's tenancy. It was impossible to ascertain what portion of the corrosion was due to defendant's usage, and the item is, therefore, rejected.

## Item No. 28

This item covers three column base plates which were damaged and needed repair. Such damage was not the result of ordinary usage. We find the fair and reasonable cost of repairing or renewing these plates is $105, which item is allowed.

## Item No. 29

This is a claim for one flag pole which was renewed at a cost of $100. The flag pole was splintered, evidently by the elements. It is not shown that any act of the defendant caused this damage, and the item is rejected.

## Item No. 30

This is a claim for cleaning roof slag from the gutters and leaders, in the amount of $750. There is no satisfactory evidence as to the amount of work required to clean the gutters and the item is rejected.

## Item No. 31

Plaintiff claims the cost of cleaning asphalt from the track rails on the north side—3,400 linear feet at $1.50 per foot—a total of $5,100. Defendant admits liability. We find the fair and reasonable cost of such removal to be 50 cents per linear foot, a total of $1,700.

The items not listed above are rejected for the reasons stated in the findings.

The plaintiff is entitled to recover for the items as listed the sum of $33,028.60.